UNITED STATES OF AMERICA *ex. rel.*
Dylan Ratigan,

        Plaintiff,

  v.

U.S. Medical Glove Company, LLC; John
Todoroki; Alexander Todoroki; Jacob
Todoroki; Ann Skemp Todoroki; Cash
Gordian; John Gibson; Sai Aung Khaing;
Rivertown Trust;

        Defendants.

**COMPLAINT**

**FILED UNDER SEAL**

**DO NOT FILE WITH PACER**

## PRELIMINARY STATEMENT

1.    From at least July 9, 2021 through January 15, 2022, and, on information and belief, continuing to the present, Defendants U.S. Medical Glove Company, LLC ("USMGC" or the "Company") and John Todoroki ("Mr. Todoroki"), along with Mr. Todoroki's co-conspirators, Defendants Alex Todoroki, Jake Todoroki, Ann Todoroki, Cash Gordian, John Gibson, and Sai Aung Khaing, used a pattern of false statements and deceit to unlawfully obtain payments from the U.S. Government totaling at least $36,624,363.94. These funds were paid pursuant to a $63,600,000 contract between the U.S. Government and Defendant USMGC as part of congressionally appropriated funds to address shortages in critical personal protective equipment caused by the COVID-19 pandemic. Defendants obtained these funds under the pretense that they would expand the industrial base of nitrile glove production by more than 1 billion gloves per year beginning in 2023. But, in reality, Defendants were intent only on enriching themselves, and knowingly made false statements about their performance of the contract to fraudulently obtain at least $36,624,363.94 of COVID-19 relief funds from the U.S. Government. Far from being used

to better prepare the United States for future national emergencies, the funds paid for the extravagant lifestyle of John Todoroki and his cohorts.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730 and 28 U.S.C. § 1331.

3.    Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) because Defendant USMGC is found in this District and a substantial part of the events giving rise to the claim occurred in this District.

4.    The facts and circumstances of the False Claims Act violations alleged in this complaint have not been publicly disclosed in a U.S. criminal, civil, or administrative hearing, nor in any congressional, administrative, or Government Accountability Office report, hearing, audit investigation, or in the U.S. news media.

5.    Relator is an original source of the information upon which this complaint is based, as that term is used in the False Claims Act.

6.    Relator disclosed the allegations of this complaint to the United States prior to its filing. Specifically, on January 24, 2023, Relator presented the allegations of this complaint to the United States Department of Justice.

## PARTIES

7.    The real party in interest to the claims set forth herein is the United States.

8.    Plaintiff-Relator Dylan Ratigan is a U.S. citizen and resident of New York. From May 2021 to January 2022, Mr. Ratigan was the CEO and Manager of USMGC, and he signed the $63,600,000 contract with the U.S. Government on USMGC's behalf. During the relevant time, Mr. Ratigan also held an indirect ownership interest in USMGC through WPP 3MP LLC. In addition, Mr. Ratigan is the sole member of several related companies: (1) TTR Technology, LLC;

(2) U.S. Medical Manufacturing, LLC; (3) U.S. Medical Sales, LLC; and (4) U.S. Medical Holding Company, LLC.

9.    Defendant U.S. Medical Glove Company, LLC is a company organized under the laws of Kentucky with its principal place of business in Illinois. On May 27, 2021, it entered a contract with the U.S. Government to make 24 nitrile glove manufacturing machines within 24 months (i.e., by May 2023) in exchange for $63,600,000. These machines would be capable of producing approximately 2.31 billion FDA-certified nitrile gloves per year.

10.    Defendant John Todoroki is, on information and belief, a U.S. citizen and resident of Colorado. During the relevant period, although John Todoroki had no formal role at USMGC, he was the Company's owner-in-fact and executive-in-fact, exercising supervision and managerial authority over USMGC's operations, including the submission of numerous false claims to the U.S. Government.

11.    Defendant Alexander ("Alex") Todoroki is, on information and belief, a U.S. citizen and resident of Colorado. Alex Todoroki was, at all relevant times, an indirect owner of USMGC and a nominee of Mr. Todoroki.

12.    Defendant Jacob ("Jake") Todoroki is, on information and belief, a U.S. citizen and resident of Colorado. Jake Todoroki was, at all relevant times, an indirect owner of USMGC and a nominee of Mr. Todoroki.

13.    Defendant Ann Skemp Todoroki is, on information and belief, a U.S. citizen and resident of Colorado. Ann Todoroki was, at all relevant times, an indirect owner of USMGC and a nominee of Mr. Todoroki.

14.    Defendant Cash Gordian is, on information and belief, a U.S. citizen and resident of Nevada. Mr. Gordian was, at relevant times, an employee of USMGC, including as Chief

3

Contracting and Compliance Officer. Mr. Gordian has reportedly served as the de facto Chief Executive Officer of USMGC.

15. Defendant John Gibson is, on information and belief, a U.S. citizen. Mr. Gibson was, at all relevant times, an owner of USMGC. Mr. Gibson was the Chief Operating Officer of USMGC and remained in that position until September 2022.

16. Defendant Sai Aung Khaing, also known as "AK," is, on information and belief, a Myanmarese citizen and resident of Illinois. He is an employee of USMGC who works directly for Mr. Todoroki, including controlling the company's financial accounts on Mr. Todoroki's behalf. On information and belief, Mr. Khaing has applied for asylum in the United States, which application is pending adjudication.

17. Defendant Rivertown Trust is a trust established under the laws of Colorado. Ann Todoroki is the nominal settlor of the trust and receives distributions of all income it generates. Jake Todoroki is the trustee. Jake and Alex Todoroki are beneficiaries of the trust. On information and belief, the Rivertown Trust is an alter ego of Mr. John Todoroki and was used by him to receive and hide the proceeds of the fraud described in this complaint.

## FACTS

## I. APPLICABLE STATUTE: THE FALSE CLAIMS ACT

18. The False Claims Act ("FCA") establishes liability to the United States for any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id*. at § 3729(a)(1)(B). "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate indifference. *Id*. at § 3729(b). No proof of specific intent to defraud is required.

19. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 88 Fed. Reg. 5776, 5778 (2023), any person found to have violated the FCA is liable for a civil penalty per false claim ranging from a minimum of $13,508 to a maximum of $27,018, plus three times the amount of damages sustained by the government. *Id.*

20. The statute allows any person having information about an FCA violation to bring an action on behalf of the U.S. Government and to share in any recovery obtained. The FCA requires that the complaint be filed under seal for a minimum of 60 days, without service on Defendants during that time, to allow the U.S. Government time to conduct its own investigation and to determine whether to join the suit.

21. The FCA contains anti-retaliation provisions, which prohibit an employer from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations." 31 U.S.C. § 3730(h)(1). The relief available to an employee under this provision is two times the amount of back pay plus interest, reinstatement with the same seniority status, and compensation for any special damages, including litigation costs. *Id.* at § 3730(h)(2).

22. Based on the FCA, Plaintiff-Relator seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein, in every jurisdiction to which Defendants' misconduct has extended.

## II.     BACKGROUND OF MR. RATIGAN, MR. TODOROKI, AND ALEX TODOROKI

23. Mr. Ratigan is a media personality who, since 1995, has been a well-known pundit on topics related to economics and finance. He began his career as Bloomberg's first dedicated mergers and acquisitions reporter and its youngest Global Managing Editor. Mr. Ratigan then hosted numerous television shows, including Bloomberg Markets, Morning Call, On the Money,

Bullseye, Closing Bell, Fast Money, and The Dylan Ratigan Show. Mr. Ratigan moved on from the media industry to other ventures beginning in 2012, including working with U.S. veterans returning from Iraq and Afghanistan to boost their employment opportunities. Mr. Ratigan also co-founded Helical Holdings and helped create its product, the Outpost, which is a shipping container housing a solar power station and hydroponic farm with the ability to provide clean water and Wi-Fi in remote areas. Mr. Ratigan continues to be involved in civic causes, producing a feature documentary about the wrongful conviction of a young man who spent a decade in prison before his conviction was overturned, and running for election to the U.S. House of Representatives in New York's 21st District in 2018. Currently, Mr. Ratigan appears weekly on various podcasts, and he has been an outside advisor to Hotel Planner, the world's largest online group travel company, for approximately a decade.

24.     Mr. Ratigan met John Todoroki through an intermediary in 2016.

25.     Mr. Todoroki claimed to Mr. Ratigan that he was previously involved in numerous professional endeavors, including having run Radio Free Europe and Asia, having worked on behalf of U.S. intelligence agencies, and having purchased nuclear material on behalf of the Central Intelligence Agency. Mr. Ratigan has not been able to confirm or deny any of these claims.

26.     In April 2019, Mr. Todoroki was arrested and charged with marijuana-related offenses in Myanmar in connection with one of his companies, III M Global Nutraceuticals, which held itself out as the first licensed hemp business in Myanmar. Mr. Todoroki's charges included possession, sale, and trafficking of marijuana. Local police raided Mr. Todoroki's hemp farm and detained him. In July 2019, a Myanmar court granted Mr. Todoroki medical bail.

27. On information and belief, Mr. Todoroki fled Myanmar in October 2019 by crossing into Thailand. On information and belief, in February 2020, authorities in Myanmar issued a warrant for his arrest, and he remains a fugitive.

28. Alex Todoroki worked with Mr. Todoroki in Myanmar and, on information and belief, was also charged in Myanmar with crimes related to the production of marijuana and remains a Myanmarese fugitive.

29. Prior to and after Mr. Todoroki's arrest in Myanmar, Mr. Ratigan and Mr. Todoroki collaborated on several business opportunities including working to place Mr. Ratigan's Outposts in Asia and meeting with the Foundation for the Royal Family of Thailand regarding obtaining land for a hemp farm. None of these business opportunities progressed.

30. In connection with the Thailand hemp proposal, Mr. Ratigan and Mr. Todoroki utilized an existing company, WPP 3MP LLC, created under the laws of Delaware. As of December 2019, WPP 3MP LLC had the following ownership structure: Alex Todoroki (20%), Dylan Ratigan (20%), and the Rivertown Trust (60%). Significantly and purposefully, John Todoroki has no ownership interest in WPP 3MP LLC.

## III. USMGC IS ESTABLISHED IN RESPONSE TO A SHORTAGE OF PERSONAL PROTECTIVE EQUIPMENT IN THE UNITED STATES DUE TO COVID-19

31. In March 2020, COVID-19 was detected in the United States.

32. The outbreak of the virus resulted in widespread lockdowns and a shortage of personal protective equipment ("PPE"), which was needed to protect healthcare workers and the general citizenry. PPE is a broad category of medical goods that includes nitrile gloves.

33. In May 2020, Mr. Todoroki called Mr. Ratigan claiming that he could import PPE from his contacts in Asia to be sold in the United States. He sought to partner with Mr. Ratigan,

who had extensive contacts in the U.S. Government and state governments, to import this PPE and re-sell it to government agencies.

34.     Although Mr. Ratigan reached out to his contacts to set up buyers for the PPE Mr. Todoroki claimed he could import, no PPE ever arrived.

35.     In June 2020, Mr. Ratigan and Mr. Todoroki discussed the ongoing need for PPE in the United States and the possibility of starting a nitrile glove manufacturing company. Thereafter, Mr. Ratigan began calling contacts around the world in search of a glove-making machine.

36.     Mr. Ratigan eventually connected with Richter Rubber Technology ("RRT"), a preeminent manufacturer of condom-making machines, and placed Mr. Todoroki in contact with RRT.

37.     RRT stated that its machines had already been adapted to make gloves. In July 2020, Mr. Todoroki negotiated for RRT to grant him and Mr. Ratigan a license to build RRT's glove-making machines. Mr. Ratigan and Mr. Todoroki, through their pre-existing company, WPP 3MP LLC, signed a Memorandum of Understanding (the "MOU") with RRT.

38.     Under the MOU, RRT provided the schematics for the glove-making machine and WPP 3MP received the right to build the machine in North America. In exchange, RRT was to receive a percentage of any revenue made from the glove-making machine.

39.     In October 2020, USMGC was formed in Lexington, Kentucky for the purpose of manufacturing the nitrile gloves using the machine schematics licensed from RRT. The Company was organized by retired Major General Mike Davidson, a veteran of the Vietnam War and owner of Resurgent, LLC, a company that receives special preferences regarding government contracts

because it is owned by a disabled veteran. General Davidson was appointed as USMGC's first CEO and Manager.

40. At the time of its formation, the ownership structure of USMGC was: WPP 3MP LLC (65%); Resurgent, LLC (10%); John Gibson (5%); and Outstanding Treasury Shares (20%). General Davidson opened USMGC's bank account at a Chase Bank branch in Lexington, Kentucky, and he was the signatory on the account.

41. Although Mr. Todoroki had no formal role or ownership interest in USMGC, he exercised de facto control over the Company's operations.

42. Mr. Todoroki, Mr. Ratigan, and General Davidson intended that USMGC would build the glove-making machine and produce gloves to be sold in the United States.

## IV. USMGC'S RECEIPT OF THE CONTRACT AT ISSUE

43. Through the American Rescue Plan Act, Congress appropriated funds to the U.S. Department of Health and Human Services ("HHS") to secure the production of PPE related to the outbreak of COVID-19 in the United States. HHS delegated administration of contracts for this purpose to the U.S. Department of Defense ("DOD").

44. Thereafter, the DOD's Defense Assisted Acquisition Cell led efforts to increase the domestic production capacity of nitrile gloves, including announcing millions of dollars in contracts and contract modifications for this purpose in May 2021.[1]

45. In connection with these efforts, on November 16, 2020, the DOD sent an email to USMGC (specifically to Mr. Ratigan and Mr. Todoroki's USMGC email addresses) soliciting a bid on a DOD contract to expand U.S. glove-manufacturing capacity. The email explained that,

---

[1] https://www.defense.gov/News/Releases/Release/Article/2639178/dod-announces-2263-million-in-industrial-base-expansion-actions/

"[b]ased on market research we are aware that U.S. Medical Glove Co. LLC is working in the glove industry. As such, we wanted to make you aware of a newly opened contracting vehicle to expand the industrial base for gloves in the US through the Commercial Solutions Opening (CSO)." The email also explained "[t]his request for proposal is an excellent opportunity to receive government support in expanding the capabilities of glove-making within the United States to support the nation's needs."

46.     Mr. Todoroki, Mr. Ratigan, and General Davidson determined to have USMGC bid on this contract.

47.     General Davidson—USMGC's then-CEO and Manager—submitted the necessary materials, including information that Mr. Todoroki provided to him regarding the alleged status of the glove-making machine and USMGC's alleged existing sales contracts.

48.     Toward the end of the contract award and review process, USMGC required a building to house any contract-funded manufacturing machines. In May 2021, General Davidson signed a lease for a building in Kentucky and hosted U.S. Government personnel for a required site visit at the leased building.

49.     Shortly thereafter, conflict developed between General Davidson and Mr. Todoroki, and General Davidson was forced out as CEO and Manager for "cause." The resolution removing General Davidson was signed by Mr. Ratigan, John Gibson, Alex Todoroki, and Jake Todoroki. Thereafter, USMGC's members appointed Mr. Ratigan as the new Manager.

50.     On May 27, 2021, USMGC released a statement that it had appointed Mark Warren "as Interim division President" and that it had hired Mazars USA LLP and Klehr Harrison Harvey Branzburg LLP to support the company. Mr. Ratigan arranged for Mazars to bring in professional management, and never intended to be a long-term Manager of USMGC.

10

51.     The same day, USMGC entered into a contract with the U.S. Government to manufacture 24 glove-making machines within 24 months (i.e., by May 2023) in exchange for $63,600,000 (the "Contract"). The machines, once operational, would be capable of delivering approximately 2.31 billion FDA-certified nitrile gloves per year.

52.     Mr. Ratigan signed the Contract on behalf of USMGC.

53.     On May 28, 2021, DOD announced that it had awarded a $63,600,000 contract to USMGC to increase domestic production capacity of nitrile gloves.[2] The press release noted that the Contract would allow USMGC to significantly increase production capacity of nitrile gloves in Fort Knox, Kentucky, including creation of 24 new production lines:

> **DOD Awards $63.6 Million Contract to US Medical Glove Company, LLC. to Increase Domestic Production Capacity of Nitrile Gloves**
>
> On May 27, 2021, the Department of Defense (DOD), on behalf of and in coordination with the Department of Health and Human Services (HHS), awarded a $63.6 million contract to US Medical Glove Company, LLC. to increase domestic production capacity of nitrile gloves.
>
> This industrial base expansion effort will allow US Medical Glove to increase production capacity of nitrile gloves by 2.31 billion gloves per year in Fort Knox, Kentucky, by May 2023. The award will facilitate the production of 24 new production lines to support domestic nitrile exam glove manufacturing.

54.     The Contract included terms outlining the performance required of USMGC. Through the use of Contract Line Items ("CLINs"), the Contract described specific deliverables to be produced and how each item would be invoiced. CLIN 1 and 3 each required completion of

---

[2]   https://www.defense.gov/News/Releases/Release/Article/2639178/dod-announces-2263-million-in-industrial-base-expansion-actions/.

batches of 12 glove-making machines. CLIN 2 related to, among other things, the development of intellectual property, chemicals, and storage.

55. The Contract required USMGC to register in the System for Award Management ("SAM") to submit invoices and receive payments. Invoices under the Contract were to be submitted for review and processing through the Procurement Integrated Enterprise (referred to as "Wide Area Workflow").

56. The Contract also stated that by submitting invoice packages to the U.S. Government, the supplies billed for had been shipped or delivered in the quantities shown on the relevant invoices, and that such supplies were in the quantity and of the quality indicated in the relevant contract, order, or purchase agreement. In addition, the Contract required USMGC to submit monthly Production Progress Reports.

57. The Contract was amended three times. In the September 2021 amendment, USMGC promised to have its first glove-making machine running in December 2021.

## V. MR. TODOROKI DIRECTS MR. RATIGAN TO FALSIFY USMGC'S SAM REGISTRATION

58. On July 13, 2021, in order to register USMGC's bank account to receive payments on the Contract, USMGC had to update its SAM account.

59. SAM is a U.S. Government system that acts as a clearinghouse for information regarding government contractors and representations and warranties by government contractors. Government contracting officers and employees reviewing payment requests rely on information entered in SAM when determining whether to award contracts to companies and whether to pay invoices submitted by those companies.

60.   To update USMGC's SAM account, Mr. Ratigan and others were required to delete the prior account created by General Davidson—who was no longer working with USMGC—and create a new registration.

61.   In connection with re-registration, SAM required Mr. Ratigan to respond to various questions, including questions about the ownership structure of USMGC. Mr. Todoroki directed Mr. Ratigan to identify USMGC in SAM as a "single member disregarded entity." This was not true.

62.   On information and belief, Mr. Todoroki directed Mr. Ratigan to make this false representation in SAM to conceal the fact that he, through his sons, was a beneficial owner of USMGC because Mr. Todoroki believed that if the U.S. Government was aware of his involvement, it would refuse to make payments to USMGC due to his arrest and criminal charges in Myanmar.

63.   On information and belief, if the U.S. Government knew of Mr. Todoroki's ownership of and role at USMGC, it would have either delayed or refused to make payments to the company because of Mr. Todoroki's criminal background in Myanmar, including, at a minimum, the invoices the U.S. Government paid on July 21, 2021, September 28, 2021, November 16, 2021, and December 1, 2021.

64.   USMGC's representations made via SAM, including the misrepresentation regarding the nature of the Company, were incorporated by reference into the Contract.

## VI.   DEFENDANTS KNOWINGLY SUBMITTED FALSE STATEMENTS THROUGH INVOICES AND PROGRESS REPORTS TO RECEIVE PAYMENTS FROM THE U.S. GOVERNMENT

65.   The U.S. Government has paid USMGC at least $36,624,363.94.

66.   Payments were made according to invoice packages submitted on the following dates related to progress on specific CLINs:

a. <u>July 13, 2021</u>: Government invoice package totaling $12,771,395.20 related to CLIN 3;

b. <u>September 28, 2021</u>: Government invoice package totaling $7,435,851.21 related to CLIN 1;

c. <u>November 16, 2021</u>: Government invoice package totaling $13,423,362.09 related to CLINs 1 and 2;

d. <u>December 1, 2021</u>: Government invoice package totaling $2,993,755.44 related to CLIN 2.

67.     On information and belief, the U.S. Government made additional payments to USMGC after December 1, 2021.

68.     All payments to USMGC were made based on false statements submitted by Defendants to the U.S. Government regarding USMGC's progress under the Contract and false records of expenses that USMGC claimed to have incurred.

69.     On information and belief, if the U.S. Government had known the truth—that numerous of USMGC's claimed expenses were fabricated as a means of obtaining money for Mr. Todoroki's personal use and that USMGC was actually making little, if any, progress toward performing the Contract—the Government would not have paid any of these invoices.

**A.     False July 9, 2021 Progress Report Causes U.S. Government to Pay Invoices**

70.     On July 9, 2021, USMGC submitted its first Progress Report, which contained numerous false statements.

71.     For example, USMGC claimed it had "secured 111,666,000 million gloves per month in orders with delivery start dates in September 2021."

72.     USMGC did not have such orders.

73.     Similarly, USMGC's July 9, 2021 Progress Report stated it had "60,000,000 gloves pre-sold to a national (fortune 50) reseller to smaller medical clinics, dental offices, EMP, Fire and

14

law enforcement. The Company has high confidence we can meet the glove production goal with only just5-6 [*sic*] customers including VAH."

74.     As of July 9, 2021, USMGC had not entered into a contract to pre-sell gloves.

75.     USMGC falsely represented these purported orders and contracted glove sales to the U.S. Government in order to mislead the U.S. Government into believing that the company was actually building the glove-making machines pursuant to the contract and would be producing gloves by late summer 2021.

76.     The July 9, 2021 Progress Report also claimed that, "US Medical Glove Company is the only federal awardee recipient that has designed and produced an American made glove machine that can make gloves in America. As a result, we are receiving orders for more than 80 machines from other contract awardees recipients [*sic*] like Renco, United Safety, and even Rhino."

77.     As of July 9, 2021, USMGC did not: (1) have orders for more than 80 machines; (2) design the glove-making machine, but rather licensed the schematics from RRT; or (3) make the machines, which were built by a separate company, Advantech.

78.     The July 9, 2021 Progress Report also stated that "USMGC deactivated in SAM to reactivate and circumvent [a] system glitch on 7/8/2021." USMGC actually deleted its SAM registration because it lost access to the account after removing General Davidson from the Company.

79.     The July 9, 2021 Progress Report was submitted pursuant to a requirement in the Contract. If USMGC had not submitted the Progress Report, it would have been in default of the Contract, and the U.S. Government would not have paid subsequent invoices that USMGC

submitted, including those on July 21, 2021, September 28, 2021, November 16, 2021, and December 1, 2021.

80.     Similarly, if USMGC had submitted an accurate Progress Report on July 9, 2021, reflecting that the company had taken no significant steps to actually perform the contract and had no prospect of manufacturing gloves in the near future, the U.S. Government would not have paid those invoices.

**B.      False January 15, 2022 Progress Report Causes U.S. Government to Pay Invoices**

81.     USMGC also submitted a Progress Report to the U.S. Government on January 15, 2022, that knowingly contained false statements.

82.     For example, the Progress Report stated that a "change reduced the stress and flexing of the steel outer skeleton to more favorable tolerance levels, improving speed from 180 GPM to 200+," but, upon information and belief, there was no working glove-making machine as of January 2022, so the speed of the machine could not have increased as stated in the January 15, 2022 Progress Report.

83.     USMGC's false statements that it had operational glove-making machines in January 2022 were material to the U.S. Government's payment of invoices submitted after that date. If USMGC had truthfully reported that it had no operational glove machines in January 2022, it would have admitted that it was in violation of its obligations under the Contract.

84.     Prior to January 2022, the U.S. Government had already paid USMGC more than $36 million. If USMGC had admitted that it had not built any functional glove-making machines with that money, the U.S. Government likely would not have continued paying invoices the company submitted.

85.     Further, the January 15, 2022 Progress Report misleadingly referenced "R&D on plastic injection mold"; but, USMGC had not conducted substantive research to develop any plastic injection hand molds.

86.     USMGC's false statement that it was conducting research and development was material to the U.S. Government's payment of invoices submitted after the date of the Progress Report. And, as described in greater detail below, as part of its invoice packages, USMGC relied on falsified records of intellectual property expenses that never actually occurred. If USMGC had truthfully reported that it was not conducting, through TTR, research and development in the Progress Report, the U.S. Government would have recognized that the submitted invoices were false and not paid them.

87.     Mr. Todoroki personally drafted USMGC's Progress Reports with the assistance of Defendant and USMGC employee Sai Aung Kaing, also known as "AK." Defendant Cash Gordian and Ken Wilson, two USMGC employees, edited the Progress Reports, and Gordian transmitted them to the U.S. Government.

**C.     USMGC Submits False Purchase Orders and Vendor Invoices to Cause U.S. Government to Disburse Funds**

88.     Mr. Todoroki also directed AK, Gordian, Wilson, and other USMGC employees to produce false purchase orders and false vendor invoices to support USMGC's invoice packages that it submitted to the U.S. Government to justify drawing down on the Contract including invoice packages submitted to the Government on July 21, 2021, September 28, 2021, November 16, 2021, and December 1, 2021.

**1.     November 2021 and December 2021 Invoice Packages Included False Records of Expenses Never Actually Incurred**

89.     For example, Mr. Todoroki directed AK to create a false $574,967 vendor invoice from TTR for "Manufacturing IP" for hand molds to justify over half a million dollars in

government funding as part of USMGC's third invoice package submitted in November 2021. In reality, TTR performed no services for USMGC and received no money from USMGC.

90. If the U.S. Government had known that the November 2021 invoice package was based, in part, on false records of expenses that USMGC did not actually incur, it would not have paid that invoice package.

91. At the same time as preparing this fake invoice to justify a U.S. Government payment of $574,967 to USMGC as part of the November 2021 invoice package, Mr. Todoroki also began paying himself $66,000 per month via WPP 3MP LLC using funds from the U.S. Government.

92. USMGC's fourth invoice package, submitted in December 2021, was also based, in part, on a false TTR vendor invoice which, on information and belief, Mr. Todoroki directed Defendants to prepare.

93. TTR had still not performed any services for USMGC, and USMGC had paid no money to TTR.

94. If the U.S. Government had known that the December 2021 invoice package was based, in part, on false records of expenses that USMGC did not actually incur, it would not have paid that invoice package.

95. In order to conceal the TTR fake invoice scheme, Mr. Todoroki ordered USMGC to engage and pay Kim Intellectual Property Law Group, LLC ("Kim Law Group") to prepare and submit a patent application for TTR's hand molds, despite the fact that TTR was not actually working on any hand molds. Kim Law Group submitted invoices to USMGC for $3,249.20 on December 2, 2021, and $1,555.80 on February 2, 2022, for this purported work.

96. Mr. Todoroki directed Kim Law Group to perform this work to provide seemingly legitimate records supporting the false assertion that USMGC and TTR were engaged in intellectual property and research and development work and to prevent the U.S. Government from detecting the falsity of the TTR invoices that were created to support the November 2021 and December 2021 invoice packages.

97. Meanwhile, USMGC used government funds to pay Diptech and Batesville Hand Formers for their hand form designs, the very thing that TTR was allegedly creating.

98. In 2021, USMGC invoiced for and received a total of $36,624,363.94 from the U.S. Government under the Contract. In January 2022, USMGC had a bank account balance of over $17,000,000, reflecting the fact that USMGC was not actually using the U.S. Government funds to pay vendors to build the glove machines that the Contract required.

99. To silo important information regarding the scheme, Mr. Todoroki instructed Defendants, in writing, not to share data and information related to government invoicing and supporting Company "purchase orders" with USMGC's controller and purchase officer.

## VII. DEFENDANTS UNLAWFULLY USED FUNDS PAID UNDER THE CONTRACT FOR PERSONAL EXPENSES AND LUXURY SPENDING

100. In sum, the false statements described in paragraphs 58 through 99 were used to secure a total of $36,624,363.94 through the following four payments:

a. July 13, 2021: Government invoice package totaling $12,771,395.20 related to CLIN 3;

b. September 28, 2021: Government invoice package totaling $7,435,851.21 related to CLIN 1;

c. November 16, 2021: Government invoice package totaling $13,423,362.09 related to CLINs 1 and 2;

d. December 1, 2021: Government invoice package totaling $2,993,755.44 related to CLIN 2.

101. Rather than being used in accordance with the Contract, funds paid by the U.S. Government to USMGC based on Defendants' false statements were used to fund an extravagant lifestyle for Mr. Todoroki.

102. Mr. Todoroki directed all payments and spending for USMGC, including payments made from USMGC to WPP 3MP LLC, for Mr. Todoroki's personal use. These payments were inconsistent with the three CLINs and in amounts that violated provisions of the Contract—all of which constitutes fraud on the U.S. Government.

103. On information and belief, Mr. Todoroki caused USMGC to use government funds to pay for lavish hotels, dining, and shopping sprees at luxury stores, including hotel rooms at the Peninsula and Ritz hotels in Chicago costing approximately $1,000 per night. Mr. Todoroki routinely ordered Mr. Ratigan, Mr. Gordian, and Mr. Khaing to pay these bills with USMGC's debit cards, and he would often joke that no one wants their name on large hotel and restaurant bills in case the U.S. Government asks questions about the use of the Contract funds.

104. Mr. Todoroki also caused USMGC to use government funds to purchase multiple Ford Explorers, one of which he sent to his wife in Colorado, who had no involvement with USMGC.

105. USMGC regularly used government funds to charter planes to fly Mr. Todoroki to various places, including his home state of Colorado. Mr. Todoroki also caused USMGC to spend significant amounts of money on unnecessary expenses, including armed security, a high-tech tactical room, and security cameras for an Illinois factory that was empty at the time.

106. This extravagant lifestyle was funded with taxpayer money meant to respond to the country's shortage of PPE but misappropriated by Defendants.

## VIII. DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR WHEN HE COMMENCED AN INVESTIGATION INTO THE ALLEGED SCHEME

107. In December 2021, Mr. Ratigan began to realize the nature and depth of Defendants' misconduct.

108. On January 13, 2022, Defendant Gordian, USMGC's notional Chief Compliance Officer, sent Mr. Ratigan a letter identifying improprieties by the company and by Mr. Todoroki in connection with the company's invoicing to the U.S. Government.

109. The next day, on January 14, 2022, Mr. Ratigan retained the law firm Vinson & Elkins LLP to conduct an internal investigation into the allegations of fraud. That same day, Mr. Ratigan announced the investigation to the company, including to certain of the Defendants, informing them that he had "received potentially credible complaints alleging serious possible violations of the Company's contract obligations and procurement laws and regulations."

110. Mr. Ratigan continued:

> As you all should be aware, a federal statute and the Defense Federal Acquisition Regulation Supplement ("DFARS") expressly prohibits a contractor, such as our Company, from discharging, demoting, or otherwise discriminating against anyone as a reprisal for disclosing information that any employee reasonably believes is evidence of gross mismanagement of a DoD contract, a gross waste of DoD funds, an abuse of authority relating to a DoD contract, a violation of law, rule, or regulation related to a DoD contract (including the competition for or negotiation of a contract). This means that no one associated with the Company may take any action that is aimed at punishing any individual employee who raises any issues to V&E. We must all be mindful of this prohibition and again, we must ensure that the investigation is permitted to run its course with our full support and without any interference.

111. He further directed all company employees to preserve all records and warned that "[a]nyone who deletes, destroys or compromises Company records faces disciplinary action including up to termination, and in addition, such activity could be deemed obstruction of the Company's investigation."

112.    Later that same day, Mr. Ratigan's personal attorney sent a letter to certain of the

Defendants stating:

> Pursuant to his authority as Manager, Mr. Ratigan has retained Vinson & Elkins
> LLP to represent US Medical in investigating compliance with its statutory and
> regulatory obligations in the administration and performance of US Medical's
> Contract with the United States Air Force, Contract No. FA8576-21-C-
> 0002. Vinson & Elkins will also provide US Medical with advice on any reporting
> obligations it may have under the Federal Acquisition Regulation, and any
> violations of the False Claims Act, 31 U.S.C. § 3729-33.

113.    The letter continued:

> Should US Medical or any of its Members retaliate against Mr. Ratigan for
> engaging Vinson & Elkins or taking other action to ensure that US Medical is
> complying with its obligations under its Contract, Federal regulations, and the
> False Claims Act, Mr. Ratigan would enforce his statutory right of protection
> against such retaliation.  In addition, if any Member of US Medical were to
> obstruct Vinson & Elkins engagement, Mr. Ratigan would seek other means to
> ensure US Medical's compliance with its Contract, applicable regulations, and
> the False Claims Act.

114.    Despite both of these advisements as to the law prohibiting retaliation against Mr.

Ratigan, Defendants immediately retaliated.

115.    Defendants unlawfully terminated Mr. Ratigan as CEO of USMGC, depriving him

of a monthly salary of $37,500 and other employment benefits.

116.    Defendants also purportedly removed Mr. Ratigan as a manager of the company.

117.    Mr. Todoroki instructed his armed security guards to deny Mr. Ratigan access to

the USMGC factory and to escort him off the property at gunpoint.

118.    Defendants then made provably false allegations of theft against Mr. Ratigan as a

claimed basis, but obvious pretext, for these retaliatory actions.

119.    To this day, Defendants continue to harass Mr. Ratigan and threaten him with

frivolous litigation as a result of his whistleblowing.

## COUNTS

### COUNT 1
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)
**(False Progress Reports - False Record or Statement Material to a False or Fraudulent Claim)**

120.     Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

121.     By virtue of the acts described above, including the creation and submission of false statements in Progress Reports to the U.S. Government, Defendants knowingly made, used, caused to be made, and caused to be used a false record or statement material to a false or fraudulent claim to get the false or fraudulent claims paid or approved by the U.S. Government in violation of 31 U.S.C. § 3729(a)(1)(B).

### COUNT 2
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)
**(False Purchase Orders and Invoices - False Record or Statement Material to a False or Fraudulent Claim)**

122.     Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

123.     By virtue of the acts described above, including the creation of false and fraudulent invoices and purchase orders, Defendants knowingly made, used, caused to be made, and caused to be used a false record or statement material to a false or fraudulent claim to get the false or fraudulent claims paid or approved by the U.S. Government in violation of 31 U.S.C. § 3729(a)(1)(B).

### COUNT 3
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)
**(Invoice Packages - Presenting or Causing Presentment of a False Claim)**

124.    Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

125.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the U.S. Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), including through false invoice packages submitted to the U.S. Government by USMGC, which included total dollar amounts premised on false and nonexistent expenses, invoices and purchase orders and contained false implied certifications that USMGC was acting in compliance with the Contract.

### COUNT 4
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)
**(False SAM Registration - False Record or Statement Material to a False or Fraudulent Claim)**

126.    Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

127.    By virtue of the acts described above, including through the falsification of USMGC's SAM Registration, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the U.S. Government in violation of 31 U.S.C. § 3729(a)(1)(B).

### COUNT 5
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)
**(False Contract - False Record or Statement Material to a False or Fraudulent Claim)**

128.    Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

129. By virtue of the acts described above, including through the execution of the Contract knowing that it contained false statements regarding the location of USMGC's manufacturing facility, Defendants used, or caused to be made or used false records and statements, to get the false or fraudulent claims paid or approved by the U.S. Government in violation of 31 U.S.C. § 3729(a)(1)(B).

### COUNT 6
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3730(h)
### (Retaliation)

130. Plaintiff-Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

131. By virtue of the acts described above, including through the termination of Mr. Ratigan after he announced an investigation into allegations that certain of the Defendants had violated the False Claims Act, and certain of the Defendants' ongoing harassment and threats of frivolous litigation against Mr. Ratigan, certain of the Defendants unlawfully retaliated against Mr. Ratigan because of the lawful acts he did in furtherance of an action under the False Claims Act and his other efforts to stop one or more violations of the Act.

### PRAYER FOR RELIEF

WHEREFORE, the United States demands that judgment be entered in its favor and against Defendants as follows:

A. Judgment against Defendants for treble damages as further established at trial plus a penalty of $23,607 per false claim as established at trial;

B. Reinstatement of Mr. Ratigan as chief executive officer and manager of USMGC;

C. Judgment against Defendants for two times the amount of backpay, interest, and such further special damages as established at trial;

D. An award to Mr. Ratigan of litigation costs and reasonable attorneys' fees;

E. Such other relief as the Court deems proper.

## **PRAYER FOR A JURY TRIAL**

The United States and Plaintiff-Relator pray for a jury trial in this action.

Dated:       Lexington, Kentucky
               May 16, 2023

Respectfully submitted,

By: _____

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
D. Seth Fortenbery
KY Bar Number: 97661
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel.: (212) 849-7000
Email: sethfortenbery@quinnemanuel.com

Michael Shaheen (*pro hac vice* forthcoming)
Robert A. Zink (*pro hac vice* forthcoming)
Jennifer Z. Gindin (*pro hac vice* forthcoming)
Nicholas Inns (*pro hac vice* forthcoming)
1300 I St. NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 538-8000
Email: michaelshaheen@quinnemanuel.com
robertzink@quinnemanuel.com
jennifergindin@quinnemanuel.com
nicholasinns@quinnemanuel.com

*Counsel for Plaintiff-Relator Dylan Ratigan*